UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LYNDA KINCH,

       Plaintiff,

v.

PINNACLE FOODS GROUP LLC, a foreign
limited liability company,

       Defendant.

_____/

Case No. 16-12840

Honorable Nancy G. Edmunds

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [10]

This matter is before the Court on Defendant Pinnacle Foods Group LLC's motion for summary judgment. (Docket 10.) Plaintiff Lynda Kinch's claims arise from the termination of her employment by Defendant. This action was removed from state court on the basis of diversity jurisdiction. (Dkt. 1.) Plaintiff brings state law claims against Defendant including claims for interference with the legitimate expectation of just-cause employment (Count I), violations of Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws §§ 37.2101 *et seq.* for discharge against public policy—retaliation (Count II), age discrimination (Count III) and sex discrimination (Count IV), and an action to compel compliance with the Bullard-Plawecki Employee Right To Know Act, Mich. Comp. Laws § 423.501 *et seq.* (Count V)[1]. (Compl., dkt. 1-1.) The Court heard this matter on May 31,

_____

[1] Count V has been resolved. Defendant provided Plaintiff's personnel file to Plaintiff's counsel in August 2016. (Def.'s Mot. 25.)

2017. For the reasons stated below, the Court will grant Defendant's motion for summary judgment.

## I. Background & Facts

Pinnacle Foods Group LLC ("Defendant" or "Pinnacle") produces Vlasic pickles and similar products at a facility in Imlay City, Michigan (the "Imlay City Plant"). (Def.'s Mot. Summ. J. 2.) Plaintiff Lynda Kinch ("Plaintiff" or "Kinch") was hired into the Imlay City Plant on February 4, 1993, when it was owned by the Campbell Soup Company, and began working for Pinnacle in 2001, following Pinnacle's acquisition of Vlasic Foods International, Inc. (Kinch Aff. ¶ 4, Pl.'s Resp. Ex. A, dkt. 14-2; Ryan Aff. ¶ 3, Def.'s Mot. Summ. J. Ex. B, dkt. 10-3.)

On February 10, 2013, Plaintiff filed a complaint for sexual harassment against operations manager Richard Raffaelli alleging that Raffaelli had made offensive comments to Plaintiff and others. (Kinch Dep. 98, dkt. 10-4; Album Aff. ¶ 3, dkt. 10-8; Formal Complaint Against Richard Raffaelli, Pl.'s Resp. Ex. E, dkt. 14-6.) In the complaint, Plaintiff alleged harassing conduct by Raffaelli beginning as early as August 2012. (Formal Complaint Against Raffaelli, dkt. 14-6.) Plaintiff went on medical leave in February 2013, due to the stress of Raffaelli's harassment. (Kinch Aff. ¶ 8.) Plaintiff was released by her doctor to return to work on April 8, 2013, and pursuant to direction of her Plant Manager, Gary Lauber, she returned to work on April 9, 2013. (Kinch Aff. ¶ 9.) Following an investigation of Plaintiff's complaint, which was conducted by outside counsel for Defendant, Defendant terminated Raffaelli's employment. (Album Aff. ¶ 4, dkt. 10-8; Kinch Dep. 101, 103, dkt. 10-4.) The parties disagree as to when Raffaelli was ultimately terminated; Plaintiff alleges both that Raffaelli was not terminated until June 2013 and was

instead on leave until then, and that Senior Vice President of Human Resources Glenn Album informed her on April 9, 2013, that Raffaelli had already been terminated. (Kinch Aff. ¶ 10; Album Dep. 102:14-20, dkt. 14-7.)

When Plaintiff returned from medical leave on April 9, 2013, Album delivered her 2012 Performance Evaluation. (Album Dep. 59, Def.'s Mot. Summ. J. Ex. H, dkt. 10-9.) While Plaintiff was on medical leave, her prior supervisor, Grace Hudson, had resigned from her position as Human Resources Manager, and Hudson's temporary replacement, Mary Gebhard, could not deliver the performance evaluation due to her status as a contract employee. (Album Dep. 59-60, 63.) Plaintiff's 2012 performance review had been written by Hudson with input from others. (2012 Performance Review Form for Lynda Studer[2], Def.'s Mot. Summ. J. Ex. F, dkt. 10-7.) Plaintiff's lowest overall rating in the 2012 review was in the category of "influencing others," rated at "below expectations." (*Id.*) Hudson made the following comments regarding Plaintiff's interactions with others:

> Lynda needs to display patience and try to be more flexible while dealing with others. The tone and style that comes accross (sic) are not always appropriate in the workforce. Lynda sometimes can be percieved (sic) as too direct and forceful. Feedback from various employees or their perceived perception, is that she talks down to employees. Lynda could get better results from others if she controled (sic) her none (sic) verbal communication and is cognizant of her tone when communicating to employees.

(*Id.*)[3]

---

[2] Now Lynda Kinch.

[3] Plaintiff's other Performance Reviews (2010-11) are discussed below, to the extent they are relevant. With respect to the 2012 Review, Hudson testified that when she was drafting Lynda's 2012 review, "Richard Raffaelli (former Operations Manager), told [her] that if [she] didn't put a negative comments on Lynda's review, he would put one on [hers]." (Hudson Aff. ¶ 24.) The 2010 review included an "overall performance rating" of "Below Expectations." Hudson was listed on the 2010 Review as the "manager," and testified via

During Plaintiff's first week back from medical leave, she participated in multiple meetings of "some sort for four days," was told there were numerous complaints about her, and was informed that she was being put on a final warning. (Kinch Aff. ¶ 11 and Album Email Apr. 15, 16, 2013, Kinch Aff. Ex. C, dkt. 14-2.) In an April 15, 2013 email, Album noted the four meetings that had occurred with Plaintiff since her return to work on April 9 and included summaries of topics and attendees at those meetings. (Album Email Apr. 15, 2013.) Album also noted that since the previous week—and following Plaintiff's 2012 evaluation—two separate human resources employees had independently complained about Plaintiff, stating that she was abrasive and gruff; in his email Album noted Plaintiff's response to this information as being "astounded." (Album Aff. ¶ 5; Album email Apr. 15, 2013.) The parties agree that these two complaints came from Theresa Fullerton, a new hire, and Louana Ruckis, a scheduler. (Def.'s Mot. Summ. J. 7; Album Aff. Ex. G, dkt. 10-8; Kinch Aff. ¶ 13, dkt. 14-2.) Plaintiff points out that no documented complaints were put into her personnel file. (Kinch Aff. ¶ 12.) Lynda's former supervisor, Hudson, testified that she "had never received any formal complaints about Lynda, let alone any serious enough to have put in her personnel file" and that to her knowledge, "there were no complaints in Lynda's file" up until the time Hudson left Pinnacle in February 2013. (Hudson Aff. ¶¶ 20, 21; dkt. 14-3.)

Album reiterated a suggestion that Plaintiff "begin working more closely with Mary Gebhard," whom they believed to be "well qualified" to coach Plaintiff and "provide

---

affidavit that "[w]ith regard to Lynda's 2010 Review, I did not have an opportunity to work with Lynda, observe her work performance or her interactions with colleagues and hourly workers during any part of 2010 since I did not return to the Imlay City plant until January of 2011." (Hudson Aff. ¶ 23.)

feedback as necessary." (Album email Apr. 15, 2013.) Album's email concluded with the following:

> Lynda, this note serves as your final warning. If we continue to hear complaints about your leadership and that you are acting in a way that is intimidating to others, we will terminate your employment without further warning. Please know, we are here to support you and truly hope the (sic) you turn the situation around as we feel you can be a great asset to the HR team and the Imlay City Plant.

(Album email Apr. 15, 2013, dkt. 14-2.)

On September 23, 2013, newly hired Human Resources Manager Michael Ryan started at the Imlay City Plant. (Ryan Dep. 6-7, Def.'s Mot. Summ. J. Ex. J, dkt. 10-11.) Ryan replaced Hudson and Gebhard as Plaintiff's direct supervisor. (Kinch Dep. 38.) Plaintiff states that from Ryan's first day until her termination, she and Ryan worked together less than 45 non-consecutive days. (Kinch Aff. ¶ 18.) During Ryan's orientation for the position, he received general feedback regarding the HR staff at the Imlay City Plant, including conversations about "how the plant could do better as far as the accuracy of its work and the timeliness of its paperwork sent from the plant to the office," and noting challenges with "non-communicative or late, untimely paperwork, untimely with forms, inaccuracies with details on employment status changes, administrative tasks that had some kind of relevance to the employees in the plant." (Ryan Dep. 13-14.) He testified to having received feedback from department leads about the perception of the HR team and he learned that "there was really an unfortunate reputation, . . . that was aligned to the HR department and so a lot of that was based on the feedback others offered with regards (sic) to [Plaintiff's] ways of working." (Ryan Dep. 24.) Ryan was unable to identify any specific instances of Plaintiff's conduct towards others, other than her treatment towards him, which

he described as "if something . . . was agitating [Plaintiff], then it became an immediate need for [Ryan] to stop what [he] was doing, be it on the phone or typing something on the computer. A couple of times [Plaintiff] would come in and close the door and simply blurt out I need to talk to you." (Ryan Dep. 27-28, dkt. 10-11.)

The parties disagree as to whether Ryan provided counseling to Plaintiff in approximately October 2013 with regard to Plaintiff's interaction with a temporary administrative employee named Teresa. (Ryan Dep. 22-23; Kinch Aff. ¶ 19.) Ryan characterized it as one of his "first coaching opportunities" with Plaintiff; Plaintiff calls Ryan's claim that he counseled her "fabricated." (*Id.*)

The parties also disagree about the characterization of a November 12, 2013 interaction between Ryan and Plaintiff. Plaintiff in her affidavit explains that HR staff had come to her with a concern about what the staff viewed as a negative article Ryan had written for the plant's newsletter. (Kinch Aff. ¶ 20.) In Ryan's absence, Plaintiff brought it to the attention of the Plant Manager to see if she could do something before it went to print. (Kinch Aff. ¶ 20.) Plaintiff states that the ensuing conversation with Ryan was not a "coaching" conversation and instead consisted of his chastising her and yelling at her, telling her that she had "better never ever go over his head again to the plant manager." (Kinch Aff. ¶ 21.)

Ryan's deposition testimony characterizes the November 12 interaction as "a coaching conversation with Plaintiff because she was upset by a newsletter [Ryan] had written and [Plaintiff had] approached the Plant Manager Jeannene Schaffnit rather than reaching out to [Ryan] directly." (Ryan Aff. ¶ 5.) On November 15, 2013, Ryan sent an email to himself documenting the November 12 meeting with Plaintiff, describing the

meeting as a "coaching conversation with Lynda about her approach, leadership style and failure to contact me (even while out of the office)." (Ryan Email Nov. 15, 2013, dkt. 10-3.) He noted that at a point in the meeting, Plaintiff looked at the wall clock and exclaimed, "Are we really going to sit here and waste an hour discussing this." (*Id.*) Ryan noted that he was "quite taken by Lynda's rude and curt statement." (*Id.*)

On January 10, 2014, Plaintiff made a comment to Ryan that she had "better be getting a good raise this year because of all the extra duties" she had covered during the green season[4] without extra pay. (Kinch Aff. ¶ 22.) The parties agree that Plaintiff's comment had to do with salary, and both agree that the comment did not go over well with Ryan. (Kinch Aff. 23; Ryan Aff. ¶ 8 and Ex. 4). Plaintiff explained that her statement was in jest. (Kinch Aff. ¶ 23.) On January 13, Plaintiff received an email from Ryan providing some suggestions for her to utilize in conversations with others going forward. Ryan also noted that "[w]e agree that while you have been very clear and brought up on four separate occasions your desire to see a significant increase in the annual merit compensation process (for 2013); we will need to fully review your performance against standards, and that you have my commitment to take the time for that conversation." (Ryan Email to Studer [Kinch], Jan. 13, 2014, Kinch Aff. Ex. F, dkt. 14-2.)

According to Ryan, as he drafted Plaintiff's 2013 Performance Evaluation, he "determined that despite repeated coaching regarding her demeanor, Plaintiff had showed no improvement, and very little desire or willingness to improve" and he decided to

---

[4] The "green season" is described as the busiest time of year for production and at the Imlay City Plant it generally runs from the beginning of April until the end of November or beginning of December, based upon the incoming produce. (Hudson Aff. ¶ 25, dkt. 14-3.)

terminate her "due to two key areas of great concern, attitude and behavior." (Ryan Aff. ¶ 10, 11.) Ryan's supervisor, Human Resources Director Sharmela Chandlall-Myrand, Album and Schaffnit, approved Plaintiff's termination. (Ryan Dep. 12, 37-38; Album Dep. 97-99; Schaffnit Dep. 64-65, 90. dkt. 10-12.)

On January 28, 2014, Ryan terminated Plaintiff's employment with Defendant. Plaintiff initially filed suit in state court and the complaint was removed to this Court on August 2, 2016.

## II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Rule 56 also provides that

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party." *Hager v. Pike Cnty. Bd. Of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.  Analysis

### A.  Whether Plaintiff's Legitimate Expectation Claim Fails As A Matter Of Law

Plaintiff claims that she had a legitimate expectation that Defendant would only terminate her employment for good cause. (Compl. ¶ 92.) She argues that all managers and/or supervisors terminated "since Defendant Pinnacle was acquired in 2007 have been terminated for cause." (Compl. ¶ 91.) In Michigan, "[e]mployment contracts for an indefinite duration are presumptively terminable at the will of either party for any reason or for no reason at all." *Rood v. General Dynamics Corp.*, 507 N.W.2d 591, 597 (Mich. 1993).  "To overcome the presumption of employment at will, a party must present sufficient proof either of a contractual provision for a definite term of employment or a provision forbidding

discharge absent just cause." *Id.* The provision may be explicit, or comprised of "promises implied in fact." *Id.* Yet courts also recognize a legitimate expectations theory "'founded on the Court's common-law authority to recognize' enforceable obligations that arise 'outside the operation of normal contract principles." *Id.* (quoting *In re Certified Question (Bankey v. Storer Broadcasting Co.)*, 443 N.W.2d 112, 121 (Mich. 1989) (concurrence)). "The right to continued employment absent cause for termination may, thus, because of stated employer policies and established procedures, be enforceable in contract . . . ." *Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880, 894 (Mich. 1980).

In 2001, Plaintiff signed a memorandum of employment with Pinnacle Foods Corporation, just prior to Pinnacle Foods Corporation's acquisition of Vlasic Foods International Inc.'s assets. The Memorandum contained the following clause:

> Pinnacle is offering you employment after the sale on an at-will basis. Your semi-monthly salary will be $1,304.21. "At-will employment" means that either you or Pinnacle may terminate the employment relationship at any time, and for any reason, with or without cause or notice. Your benefits program will change as described in other communications to you; new human resources policies will also be implemented.

(Pinnacle Foods Corporation Memorandum, May 18, 2001, Ryan Aff. Ex. 1, dkt. 10-3.) The Memorandum contains the signature of Lynda Studer[5], dated 5/18/01. (*Id.*) Plaintiff also signed a Confidential Information and Non-Competition Agreement with Pinnacle Foods Corporation dated September 21, 2001, which provided that '[t]his Agreement is not a contract of employment, nor does it impose on Pinnacle Companies any obligation to retain Employee in its employ. To the contrary, Employee is an employee-at-will." (Pinnacle

---

[5] Now Lynda Kinch.

Foods Corporation Confidential Information and Non-Competition Agreement Sept. 21, 2001, dkt. 10-3.) "Pinnacle Companies" is defined as "Pinnacle or its subsidiaries or affiliates, or their successors or assigns, whether existing now or in the future." (*Id.*) Defendant also shows that an Employee Handbook of Pinnacle Foods Corporation states on page 3 under "Employment At Will" that "[e]mployment and compensation can be terminated, with or without cause, and with or without notice, at any time, at the option of either the Company or the employee." (Pinnacle Foods Corporation Employee Handbook 3, Def.'s Mot. Summ. J. Ex. A, dkt. 10-2.)

Defendant argues that such writings preclude a finding of a legitimate expectation of just cause employment. The Sixth Circuit has noted that it had not discovered any precedent that "an expressly at-will employment relationship may be turned into a just-cause relationship by no more than a legitimate expectation on the part of the employee," and further noted that in "all cases where courts have found a *Toussaint* just-cause relationship created by legitimate expectations, the initial employment contract was silent on the question of whether it could be terminated at will." *Mannix v. County of Monroe*, 348 F.3d 526, 533 (6th Cir. 2003). "The 'implied contract' theory of *Toussaint* may not be relied upon in Michigan when there is an express contract covering the same subject matter." *Id.* (citing *Bracco v. Michigan Tech. Univ.*, 588 N.W.2d 467, 472 (Mich. Ct. App. 1998)).

Plaintiff responds that this agreement was with another entity, "Pinnacle Corporation." (Pl.'s Resp. 17, dkt. 14.) Yet Plaintiff was unable to provide evidence or legal authority to counter Defendant's evidence that she signed an at-will agreement with Pinnacle Corporation, even though she is now employed by Pinnacle Foods Group, LLC. At the

hearing, the attorneys were questioned about the corporate lineage and it appears the parties believe that the current Pinnacle has different owners than the Pinnacle Foods Corporation with whom Plaintiff signed the agreement, though no definitive answers were forthcoming. Hudson testified that "[i]n 2001, Vlasic International was bought out by Pinnacle Corp. (*then purchased by Pinnacle Foods Group Inc. in 2007, and then bought out by Pinnacle Foods Group, LLC in 2010*)". (Hudson Aff. ¶ 10a., dkt. 14-3.)

Defendant relies on *Thurman v. DaimlerChrysler*, to support a finding that Plaintiff is bound by provisions of an employment application despite a subsequent change in corporate entity. *See Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352 (6th Cir. 2004). In *Thurman*, the Sixth Circuit found that the plaintiff was bound by provisions in an employment application that she had completed at Chrysler Corporation before the employer company became DaimlerChrysler, Inc. *Id.* at 354. The Chrysler Corporation application contained "an abbreviated limitations period in which to file suit against the company" and the Sixth Circuit upheld the district court's dismissal of the plaintiff's suit against DaimlerChrysler as untimely pursuant to this limitations period. *Id.* at 354-55, 358-59.

While there is no evidence in the *Thurman* opinion that the plaintiff expressly challenged the application of the limitations provision on the basis of the change in corporate entity, this Court finds the Sixth Circuit's application of the Chrysler Corporation provision instructive; in the absence of evidence or legal authority to the contrary, the agreement with Pinnacle precludes a finding of a legitimate expectation of just cause

employment. Plaintiff's legitimate-expectations argument neither establishes nor novates an express contract. *See Mannix*, 348 F.3d 526 (6th Cir. 2003).

Even if the Court were to conclude, as Plaintiff argues, that the signed 2001 memorandum was with a different Pinnacle than the current Defendant and that Plaintiff was not bound by the prior at-will agreement[6], the Court finds that Plaintiff's legitimate expectations claim also fails for the reasons that follow. In analyzing Plaintiff's legitimate expectations claim, the first step is to determine "*what*, if anything, the employer has promised," express or implied. *See Rood*, 507 N.W.2d at 606. "[I]f no promise is made, there is nothing to enforce." *Id.* at 607. If a promise had been made, the second step would be to "determine whether the promise is reasonably capable of instilling a legitimate expectation of just-cause employment in the employer's employees." *Id. Rood* again points out that "only policies and procedures reasonably related to employee termination are capable of instilling such expectations." *Id.*

Plaintiff argues that the new-hire documents used since 2010 do not contain at-will agreements, contracts, clauses, or provisions. (Pl.'s Resp. 17.) She distinguishes the employee handbook's reference to "at-will" employment as applicable to hourly, not salary, employees. (Pl.'s Resp. 18; Kinch Dep. 50-51, dkt. 10-4.) And she points out that the Business Code of Conduct, which is required for salaried employees to acknowledge and sign, does not reference "at-will employment." (Pl.'s Resp. 18, Ex. I, dkt. 14-10.) Plaintiff does not recall any salaried employee being terminated without just cause, and as

---

[6] Plaintiff was asked when she was "hired into Pinnacle," to which she responded "February of '94" without distinction as to the corporate entities. (Kinch Dep. 30.)

evidence she relies on her own affidavit and that of Grace Hudson[7].(Kinch Aff. ¶ 29; Hudson Aff. ¶ 8.) Further, Colleen Davlin had a salaried position as Safety Manager and stated by affidavit that she never signed an agreement stating that she was an at-will employee and that to her knowledge no one at the Imlay City plant has ever been terminated without cause. (Davlin Aff. ¶¶ 5-8, dkt. 14-4.) It was her "belief" and in her opinion, "common knowledge, that an employee could only be terminated for cause." (*Id.*) Former employee Keith Kinch, Maintenance Supervisor, provided an affidavit consistent with that of Davlin. (Keith Kinch Aff. ¶¶ 4-10, dkt. 14-5.) Hudson and Plaintiff aver that the new hire documents provided to newly hired salaried employees do "not include an at-will agreement or contract, nor does any document include an at-will clause or provision." (Hudson Aff. ¶ 7, dkt. 14-3; Kinch Aff. ¶ 28, dkt. 14-2.) Plaintiff also stated in her affidavit that, "To the best of my knowledge and belief, all involuntary terminations of salary employees for performance at the Imlay City facility were given a severance package." (Kinch Aff. ¶ 38.)

Plaintiff concludes that "[s]ince there is no express at will agreement, Defendant's conduct is reasonably capable of instilling a legitimate expectation of just cause employment" and that "Defendant created a culture at the Imlay City plant were (sic) the salaried employees believed and thought it was common knowledge that they couldn't be terminated without just cause." (Pl.'s Resp. 18.) Yet the law supports a presumption of at-

---

[7] Like Plaintiff, Hudson was initially hired by Campbell's Soup Company in 1992, and worked through successor employers until she tendered her resignation in January 2013, effective in February 2013. (Hudson Aff. ¶¶ 4, 5.) Hudson was the H.R. Manager of the Imlay City Plant. (Hudson Aff. ¶¶ 5, 6.) Hudson and Kinch each state that to her knowledge, during a time she worked in the H.R. Department "at the Imlay City plant, no one has ever been terminated without cause." (Kinch Aff. ¶ 29; Hudson Aff. ¶ 8.)

will employment in the absence of proof of a just-cause provision, not the other way around. Plaintiff fails to identify a promise, definite or indefinite, express or implied. Plaintiff relies on the absence of "at will" provisions in company documents, rather than the presence of "just cause" provisions, as were present in *Toussaint*, in which "the employee handbook contained an *express* statement of company policy, . . . providing that [the employer] would 'release employees for just cause only,'" and including "elaborate and specific disciplinary procedures leading up to and including discharge." *Id.* (citing *Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880 (Mich. 1980)). In considering *Toussaint* and *Renny v. Port Huron Hosp.*, 398 N.W.2d 327 (Mich. 1986), the Michigan Supreme Court noted that the common thread in these decisions that found an employee handbook "reasonably capable of instilling legitimate expectations of just-cause employment" in the employees, was that the handbooks "contained statements reasonably capable of being interpreted as promises to discharge only for just cause." *Id.* Plaintiff was asked at her deposition whether there was "anything, . . . , in writing that gave employees, other than for hourly employees, gave employees a right to employment so that they had to have good cause to terminate employees at Pinnacle" and she testified that she did not know of anything in writing. (Kinch Dep. 52, dkt. 10-4.)

Hudson testified that it was "a norm" that to terminate salaried employees, there first had to be counseling, then subsequent documentation of problems or violations, and finally, HR had to seek corporate approval for the termination; an "H.R. Manager did not have the authority to unilaterally terminate a salaried employee." (Hudson Aff. ¶¶ 10b., 11.) One former employee testified that reasons were "fabricated" to terminate her. (*See e.g.,* Davlin

Aff. ¶ 16.) Despite Plaintiff's arguments that Defendant gave employees reasons for termination and followed practices for termination, Plaintiff has not shown a basis for finding an implied promise of just cause employment. "The concept of at-will employment means not only that the employer, if it so chooses, may provide a disciplinary system and may terminate only for cause, but also that the employer may terminate for any other reason if the employer believes that that is in the best interests of the employer." *Biggs v. Hilton Hotel Corp.*, 486 N.W.2d 61, 63 (Mich. Ct. App. 1992); *see also Rowe v. Montgomery Ward & Co., Inc.*, 473 N.W.2d 268, 275 (Mich. 1991) (nothing in the "'Rules of Personal Conduct' created a contract to terminate only for cause" and "[n]othing in the rules suggested that the enumerated conduct was the only basis for dismissal").

Plaintiff's arguments expose the dearth of language, written or oral, express of implied, that could be interpreted as a promise to discharge only for just cause. The Court will grant Defendant's motion for summary judgment as to Plaintiff's legitimate expectations claim.

### B.    Whether Plaintiff Can Establish A *Prima Facie* Claim Of Retaliation

To establish a prima facie claim of retaliation, Plaintiff must show "(1) that she engaged in a protected activity; (2) that defendant knew of this exercise of her protected rights; (3) that defendant consequently took an employment action adverse to plaintiff; *and* (4) that there was a causal connection between the protected activity and the adverse employment action." *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 831 (6th Cir. 1999). While the standard is similar for a retaliation case under either Title VII or ELCRA, for claims brought under ELCRA, "the standard for causation is higher. . . . [T]he plaintiff must show that his

participation in activity protected by the [EL]CRA [sic] was a significant factor in the employer's adverse employment action, not just that there was a causal link between the two." *Jennings v. Total Bus Care, Inc.*, 09-12235, 2001 WL 1239777, at *1 (E.D. Mich. Mar. 30, 2011) (citing *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 527-28 (6th Cir. 2008) ("a retaliation claim under the ELCRA "requires showing that the plaintiff's protected activity was a 'significant factor' in the employer's adverse action" and "a plaintiff must present evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action")).

Plaintiff engaged in a protected activity: the filing of the harassment complaint against Raffaelli in February 2013. Defendant took an adverse employment action against Plaintiff when it terminated her employment. Defendant argues that Plaintiff fails to show that the decision maker who terminated her, new HR manager Ryan, knew about her complaint against Raffaelli when he made the decision to terminate her. Further, Defendant argues that Plaintiff cannot show any causal connection between her alleged protected activity and her termination because she had negative performance evaluations that pre-dated her February 2013 complaint against Raffaelli. (Def.'s Mot. Summ. J. 19.)

"An employment decision cannot be caused by protected activity if the decision-maker did not know about the protected activity." *Crane v. Mary Free Bed Rehab. Hosp.*, 634 Fed. Appx. 518, 526 (6th Cir. 2015). Plaintiff relies on circumstantial evidence to show that Ryan knew of her protected activity. *See Mulhall v. Ashcraft*, 287 F.3d 543, 552 (6th Cir. 2002) (Direct evidence that the decision-making officials had knowledge or awareness of the plaintiff's protected activity is not required and "a plaintiff may survive summary

judgment by producing circumstantial evidence to establish this element of her claim."). In an April 17, 2013 email from Mary Gebhard to Glen Album and Gary Lauber, Gebhard summarized two conversations she had with Plaintiff on April 17 and 18, 2013.[8] The email included the following sentence: "Lynda said it's still a set up as Richard wanted to put her on a PIP, as he wanted her gone, she was a whistleblower, out on disability and now is on final warning." (Gebhard email, Pl.'s Resp. Ex. K, dkt. 14-12.) Although Ryan, the decision maker, was not included on the original April 17, 2013 email, the email exhibit shows that the email was sent again on January 13, 2014 (approximately two weeks before Plaintiff was terminated), this time to Michael Ryan and Sharmela Chandlall-Myrand. (*Id.*) It is from this email that Plaintiff argues that Ryan had knowledge that she had engaged in a protected activity.

Ryan testified that he only learned about the complaint for harassment filed against Raffaelli after the fact and after Plaintiff's first court complaint. (Ryan Dep. 15, dkt. 10-11.) Yet Plaintiff's evidence raises a question of fact as to whether Ryan knew that she had been a whistleblower. Like *Mulhall v. Ashcraft*, the decision maker testified that he did not know of Plaintiff's protected activity until after he took the adverse employment action. *Mulhall*, 287 F.3d at 552. Unlike *Mulhall*, Plaintiff has provided some evidence from which a reasonable jury could infer that Ryan knew of the protected activity-- he received an email two weeks prior to Plaintiff's termination, which identified her generally as a "whistleblower." The *Mulhall* plaintiff had provided only "conspiratorial theories." *Id.* Further, *Mulhall* notes

---

[8] It appears that the April 17, 2013 email purports to summarize conversations on the following dates: "4-17-2013" and "4-18-2013". There is an error in the dates set forth in the email.

that "at least one district court has concluded that knowledge of a plaintiff's protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action." *Id.* at 553. Plaintiff argues that because Ryan, Chandlall-Myrand and Album all received the email, "it is reasonable for jury (sic) to infer that they discussed the matter in more depth outside of the email." (Pl.'s Resp. 22.) Plaintiff has raised a genuine issue of material fact as to this element.

Plaintiff next attempts to show evidence of a causal connection between her reporting of harassment by Raffaelli and her termination and that her complaint was a significant factor in the termination. Despite nearly one year elapsing between Plaintiff's complaint against Raffaelli and her own termination, she argues that Defendant engaged in the retaliatory conduct at its first opportunity to do so. The "green season" is the busiest time of year for production and at the Imlay City plant it generally runs from the beginning of April until the end of November or beginning of December, based upon the incoming produce. (Hudson Aff. ¶ 25, dkt. 14-3.) Hudson, the HR manager, left the company in February 2013. (Hudson Aff. ¶ 25.) Hudson testified that if the company had terminated Plaintiff when Plaintiff returned from medical leave, it "would have devastating consequences for the company, in particular the Imlay City Plant." (Hudson Aff. ¶ 25.) Plaintiff stated that after Hudson resigned, Plaintiff was the only one with enough experience to run the green season and that during the green season, she "managed the Human Resources Department working 8-12 hour days 6-7 days a week without any extra pay." (Kinch Aff. ¶¶ 16-17.) Plaintiff points out that she was terminated within eight weeks of the end of the green season.

The Court agrees with Plaintiff and, of course, the Sixth Circuit, that "'[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity,' such temporal proximity alone may satisfy the causal prong of a plaintiff's prima facie retaliation case." *Herrera v. Churchill McGee, LLC*, 545 Fed. Appx. 499 (6th Cir. 2013) (quoting *Mickey*, 516 F.3d at 523-25. Further, "a mere lapse in time between the protected activity and the adverse employment action does not inevitably foreclose a finding of causality." *Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007). The time period between the protected activity and the termination was nearly a full year and Plaintiff remained under Album's authority, were he to retaliate with termination, during that time. She was under Ryan's authority for nearly three months without termination. *See e.g., id.* (citing cases in which retaliation was delayed until the plaintiff was under the retaliating supervisor's authority). Plaintiff was ultimately terminated nearly a year after she made the complaint against Raffaelli. *Dixon*, 481 F.3d at 334 ("[T]his Court has typically found the causal connection element satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity."). The Court concludes that in this case, temporal proximity alone does not establish the causal prong of retaliation.

Plaintiff has not provided evidence to support her other causal connection argument-- that Defendant treated her "differently than other similarly situated employees who actually violated policy but were not terminated." (Pl.'s Resp. 24.) Plaintiff in her affidavit lists several employees who engaged in various transgressions ranging from yelling and cursing, to a supervisor's flaunting of an extra marital affair with a subordinate's husband,

and have not been disciplined. (Kinch Aff. ¶¶ 26, 34.) Plaintiff has not shown that these other individuals were similarly situated.[9]

The Court finds that Plaintiff has not shown evidence of causation and has failed to establish a prima facie claim for retaliation. However, even if the Court were to find that Plaintiff has provided the minimal evidence of causation necessary to establish a prima facie case, she fails to demonstrate that Defendant's reason for terminating her was pretext. The parties appear to concede that Defendant has demonstrated a legitimate, non-discriminatory reason for its decision to terminate Plaintiff's employment, supported by Ryan's testimony and the prior Performance Evaluations. Defendant has shown evidence that the decision was based upon abrasive and curt demeanor and behavior by Plaintiff.

Under the *McDonnell Douglas* burden shifting analysis, if Defendant demonstrates a legitimate non-discriminatory reason for its action, Plaintiff can demonstrate that the reason given for her termination was pretext by

> [S]howing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. The plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] did not honestly believe in the proffered nondiscriminatory

---

[9]"To be similarly situated, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000) (citation omitted). And while "[e]xact correlation is not required," they "must be similar in 'all relevant aspects.'" *Id.* Plaintiff has not demonstrated that she and any of the other individuals she identified were similarly situated. The others had different titles and positions and were in different departments. There is no evidence that they shared the same supervisor. Plaintiff has failed to identify evidence that would raise a material question of fact as to whether Defendant's proffered reason for terminating her was pretext.

reason for its adverse employment action. To show an honest belief, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.

*Mickey*, 516 F.3d at 526 (citations and internal quotations omitted); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Plaintiff's response primarily rests on the argument that she has demonstrated a causal connection and she relies on the same arguments set forth above to show that Defendant's reason was pretext. To the extent Plaintiff submits opinions of three former employees, Hudson, Davlin and Keith Kinch regarding the quality of Plaintiff's work performance, these were not decision makers. A disagreement and subjective belief about the quality of the plaintiff's job performance is "[i]n essence a mere disagreement with the corporation's business judgment and does not create an issue of fact." *Crawford v. David's Bridal, Inc.*, 07-13830, 2009 WL 307583, at *4 (E.D. Mich. Feb. 6, 2009) (citing *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160-62 (6th Cir. 1990)). Further, there is evidence that in addition to the 2012 and 2013 performance reviews, in 2010 and 2011 performance reviews, the reviewers noted areas where Plaintiff's communication style with others could use improvement. (2010 Performance Review Form, Def.'s Mot. Summ. J. Ex. D p. 5 ("Lynda must be cognizant of the fact that she is perceived as an individual who sometimes talks down to others when her response is direct and firm"), dkt. 10-5; 2011 Performance Review Form, Def.'s Mot. Summ. J. Ex. E p.6, ("Lynda's communication is at times abrasive and condescending, which results in employees avoiding her") dkt. 10-6). As set forth above, Plaintiff has taken issue with the 2010 and 2012 reviews, yet they are not

inconsistent with the 2011 and 2013 reviews. Plaintiff has not shown evidence from which a reasonable jury may reject Defendant's proffered reason for termination.

**C.    Whether Plaintiff Has Shown A Prima Facie Case For Age/Sex Discrimination**

Here, Plaintiff does not offer direct evidence of discrimination. Therefore, she goes forward under the *McDonnell Douglas* approach from which the factfinder may infer that Plaintiff was the victim of unlawful discrimination. *See DeBrow v. Century 21 Great Lakes, Inc.*, 620 N.W.2d 836, 837 (Mich. 2001). A prima facie case of discrimination under ELCRA requires a showing that (1) Plaintiff was a member of a protected class, (2) "she was subject to an adverse employment action, (3) she was qualified for the position, and (4) others, similarly situated and outside the protected class, were treated differently." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 653 (6th Cir. 2012); *see also Hazel v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001) (identifying the fourth element as showing "the job was given to another person under circumstances giving rise to an inference of unlawful discrimination."); *Tilley v. Kalamazoo County Road Comm'n*, 777 F.3d 303, 308 (6th Cir. 2015) (identifying the fourth element as showing that the plaintiff "was replaced by someone outside of the protected class"); *Meagher v. Wayne State University*, 565 N.W.2d 401, 410 (Mich. Ct. App. 1997) ("In an age discrimination case, such an inference can be drawn from the replacement of an older worker with a significantly younger worker.").  With respect to the first two elements, Plaintiff is a member of protected classes and was subject to an adverse employment action.

Defendant argues that Plaintiff has provided no evidence of age or sex discrimination other than the hiring of a younger male employee into a newly created position of HR generalist. The new HR employee was hired for a new position as Human Resources Generalist. (Ryan Aff. 12.) The HR Generalist position required more education than Plaintiff's position, including a bachelor's and master's degree, as well as both union and non-union experience, and paid more money. (Ryan Aff. Ex. 6, dkt. 10-3.) Yet the Position Request Form also indicated that it was a "Position Replacement" for "L. Studer" and it was not a new position. (Ryan Aff. Ex. 6, dkt. 10-3.) Plaintiff also argues that she was treated differently than other similarly situated supervisors and managers who had allegedly violated company policy yet were not terminated. As set forth in the discussion of the retaliation claim, above, Plaintiff has not provided evidence to support her allegations that they were indeed similarly situated. *See supra* n. 9; *see also Ondricko*, 689 F.3d at 654 (while the plaintiff need not show an exact correlation with the other employees, "the plaintiff and the employee with whom the plaintiff seeks to compare herself must be similar in 'all relevant aspects.'").

Finally, Plaintiff testified as follows regarding the basis for her allegations of sex and age discrimination:

Q: What facts do you rely upon to establish that your gender played a role in your termination?
A. I can just surmise, you know. I just believe.
Q. So you rely on your belief, you don't have any facts beyond that?
A. Yeah.
. . .
Q. Did you ever hear anybody who may have been involved in your termination make any negative comments about gender in general?

A. No.

(Kinch Dep. 181-82, dkt. 10-4.)

Q. Do you believe your age played a role in your termination?

A. Absolutely.

Q. What was your age at the time of your termination?

A. Let's see. 50.

Q. Do you know whether you are older or younger than Mr. Album?

A. I have no idea.

Q. What facts do you rely upon to establish that your age played a role in your termination?

A. I believe it was -- it was out with the old and in with the new. I mean, Michael was younger than I.

Q. Anything else other than your belief that supports your conclusion that your termination was related to your age?

A. That's enough, I think.

Q. Did anybody make any negative comments about your age while you were working at Pinnacle?

A. Oh, well, yeah, actually, when I had my 50th birthday they made me a black cake and black balloons and all that kind of stuff. And, so, yeah, it was -- you know, I was the old lady.

Q. Who made you the black cake and black balloons?

A. It came from HR staff.

Q. The people who reported to you?

A. Yeah.

Q. You thought it was funny?

A. It doesn't matter. It was there.

Q. You thought it was funny?

A. It was cute.

Q. Any negative comments about your age that were said by anybody who you reported to in HR?

A. You're asking me if Michael ever said anything?

Q. Yes. Did Michael ever make comments about your age?

A. Yeah. Just in conversations that we would have, oh, he's younger than us or whatever.

Q. Did he ever make any negative comments about your age?

A. I'm sure he did, but I can't think of anything specific.

Q. You can't tell me as we sit here today if he made any negative comments –

A. Right, was I offended.

Q. -- or any negative comments he made about your age; is that correct?

A. Correct.

(Kinch Dep. 176-78.) Similarly, Plaintiff was unable to identify any negative comments by Album related to Plaintiff's age. (Kinch Dep. 178.) Plaintiff testified that she believed that Colleen Davlin, Pat Donnelly and Keith Kinch were terminated because of their age, yet was unable to identify a reason she believed this, aside from a belief that there was a pattern of Pinnacle "getting rid of all their old people and replacing them with young people." (Kinch Dep. 178-79.) Upon further questioning, Plaintiff testified that she did not know specifically why they were terminated, but she could "surmise," and she could not identify anything else to support her belief that they were terminated because of their ages. (Kinch Dep. 178-79.)

In showing that Defendant hired a younger, male individual to perform her position, Plaintiff has met the minimum threshold necessary to establish a prima facie case of age or sex discrimination. Yet even though Plaintiff has established a prima facie case of discrimination based on age or sex, Defendant had a legitimate non-discriminatory business reason for terminating her employment, as set forth above with respect to the retaliation claim. Similarly, as set forth above, Plaintiff has not shown that the reasons for

her termination were pretext. The Court will grant Defendant's motion for summary judgment.

**IV.    Conclusion**

For the reasons set forth above, the Court GRANTS Defendant's Motion for Summary Judgment and dismisses Plaintiff's complaint.

**SO ORDERED.**

 s/Nancy G. Edmunds                                 
Nancy G. Edmunds
United States District Judge


Dated:  July 17, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 17, 2017, by electronic and/or ordinary mail.

 s/Carol J. Bethel                               
Case Manager